NANCY J. HOUGHTON & others[1] vs. LINDA JEAN JOHNSON, trustee.[2]

No. 06-P-1400.

Suffolk. May 9, 2007. - May 30, 2008.

Present: PERRETTA, DUFFLY, & KAFKER, JJ.

*Easement. Beach. Real Property,* Easement, Beach. *Adverse Possession and Prescription.*

In a civil action, sufficient evidence existed to support the judge's conclusion that the defendant owned the land seaward of her home to the mean low water elevation, where the original owner, whose conveyances to the defendant's and plaintiffs' predecessors in title described the properties as beginning and ending at the "highwater mark," failed to reserve any rights in the lands between the high and low water elevations, and did not claim a fee or other interest in those lands thereafter; where the references in the deeds to a "stake and stone" at or near the high water mark was intended as a reference point for the measurement of lot width; and where nothing in a plan of lots indicated that a later owner, in conveying to the defendant's immediate predecessor in title, was retaining the ownership of any property shoreward of the high water mark. [829-832]

In a civil action by a group of property owners seeking a judgment declaring their rights to use the beach portion of the defendant's property, the plaintiffs failed to demonstrate the existence of an implied easement, where there were no advertisements for the sale of lots suggesting a community beach, nothing in a plan of lots designated or labeled a community beach or anything comparable, and there was no showing that the plaintiffs' predecessor in interest ever promised a beach community to the plaintiffs or to their predecessors in title. [832-835]

In a civil action by a group of property owners seeking a judgment declaring their rights to use the beach portion of the defendant's property, the plaintiffs failed to demonstrate the existence of prescriptive easements, where the defendant's lot, which abutted a public beach, could not be enclosed; the plaintiffs used all of the beach for customary beach activities and did not confine themselves to the beach area of the defendant's property; none of the plaintiffs who used the disputed beach areas while enjoying the society and companionship of the defendant's predecessor in interest ever informed

[1]There are fifty-nine other plaintiffs. Their names are listed in an Appendix to this opinion.

[2]Under a declaration of trust dated June 9, 1997.

her that the plaintiffs' use was being made under right; the eight examples of alleged distinct acts conducted on the disputed area were no more than isolated incidents rather than attestations of activities continuously conducted for the prescribed twenty-year period; the defendant's predecessor in interest did not hesitate to exercise control of her beachfront property on those occasions she thought necessary to do so; and no plaintiff ever challenged the right of the defendant's predecessor in interest to exercise control of the plaintiffs' use of the disputed beach areas. [835-843]

CIVIL ACTION commenced in the Land Court Department on April 7, 2005.

The case was heard by *Keith C. Long,* J., on motions for summary judgment.

*Denise A. Chicoine* for the plaintiffs.

*Diane C. Tillotson* for the defendant.

The following submitted briefs for amici curiae:

*William V. Hovey,* pro se.

*Michael Pill,* pro se.

*Zygmunt J.B. Plater,* of the District of Columbia, pro se.

PERRETTA, J. This appeal arises out of the efforts of the defendant, Linda Jean Johnson, to prohibit the plaintiffs from using, for customary beach activities, the seaward portion of her property situated on Cape Cod Bay in Eastham under claims of implied and prescribed easements. In a detailed and comprehensive decision on cross motions for summary judgment, a Land Court judge concluded that Johnson's property extended seaward of her home to the mean low water elevation and that none of the plaintiffs has any right to use any portion of that land other than "to fish, fowl, or navigate between . . . the mean high water and mean low water elevations," and judgment entered accordingly. The plaintiffs argue on appeal that Johnson failed to meet her burden of demonstrating ownership of the tidal flats, which they claim were severed from the upland portion of Johnson's property, and that the judge erred in concluding that they had neither implied easements nor prescriptive rights in any portion of Johnson's property. We affirm the judgment.

1. *The title history of the property.*[3] Johnson purchased her property from Fred and Jane Liberatore by a deed dated August

---

[3]We set out the undisputed facts relied upon by the judge in ruling on the

31, 1999, followed by a confirmatory deed dated October 19, 2000. As shown on a plan dated June 23, 1924, and entitled "Plan of Lots, Leroy K. Houghton" (1924 plan), all of the land shown on the 1924 plan, including Johnson's property, was at one time owned by Francis Smith.

On February 14, 1923, Smith conveyed what was subsequently shown as lots 11 and 39 on the 1924 plan to Hattie Williams by a deed containing a metes and bounds description beginning and ending at the *"highwater mark"* (emphasis added).[4] By this deed, Smith also granted to Williams a right of way over his other land from the "main road [Bay Queen/Kingsbury Beach Road] to the above described premises." Next, on July 19, 1923, Smith conveyed a large lot of abutting land, described as bounded by the *"highwater mark"* (emphasis added) to Leroy K. Houghton (Houghton), while reserving for himself and his heirs "a right of way over the traveled road, over the above described premises to the west shore meaning to the water; to pass and repass." Houghton thereafter created and recorded the 1924 plan reflecting the creation of some 111 small lots.[5] A number of the plaintiffs own lots originating from this plan.

By a deed dated June 14, 1951, Jane Liberatore and her mother, Ethel T. Hicks, took title to lots 11 and 39 from the estate of Hattie Williams.[6] Those two lots were again described as beginning and ending at the high water mark. Next, on October 20, 1964, Fred and Jane Liberatore purchased from Houghton lots 10 and 40 as shown on the 1924 plan, as well as the beach area fronting lot 10 to the high water mark, that is, prop-

motions for summary judgment. The judge determined those facts on the basis of those portions of the supporting materials that contained information made with personal knowledge, would be admissible in evidence, affirmatively showed that the affiant was competent to testify to the matters set forth therein, and were free of impermissible speculation or conclusory language.

[4] As shown on the 1924 plan, lot 11 is a waterfront lot, and lot 39 is directly behind lot 11; together, the two lots form a rectangular parcel.

[5] As noted previously, the land transferred from Smith to Williams is shown on the 1924 plan as lots 11 and 39, although Houghton never held title to that property.

[6] Jane Liberatore took title to that property (lots 11 and 39) individually on May 15, 1964, and thereafter, on June 18, 1999, conveyed it to herself and her husband.

erty situated immediately adjacent to the parcel conveyed to Williams.[7] The deed from Houghton to the Liberatores described the parcel by metes and bounds, with the seaward bound beginning at a stake at the highwater mark and then proceeding southerly along the high water mark at a distance of fifty-eight feet to a stake. It is lots 10, 11, 39, and 40 that comprise Johnson's property.

Adjacent to the Williams portion of Johnson's property, on the north side, is a road identified on the 1924 plan as Bay Queen Road, now commonly known as Kingsbury Beach Road. In 1935, Houghton conveyed that road to the town of Eastham (town). There is a town-maintained public beach at the terminus of Kingsbury Beach Road.

2. *The controversy.* According to the deposition testimony of Jane Liberatore, as well as her affidavit and the affidavits submitted by the various plaintiffs, Johnson's seaward property from the foot of the sand dunes to the water was essentially treated and used by the plaintiffs as an extension of the public beach as far back as the 1940's. Jane Liberatore described her observations of the use of her beach area by others and stated that although she never gave anyone permission to use the beach area, neither did she prohibit it. Jane Liberatore was of the belief that the beach should be a community resource enjoyed by all, irrespective of whether she knew the people using her property.

In August, 2004, Johnson posted no trespassing signs on her beach frontage because it had become so increasingly crowded that there were times when she could not enjoy her own property. Those signs prompted the present declaratory judgment action.

3. *Discussion.* In taking up the plaintiffs' various claims in support of their assertion of the right to use Johnson's beach frontage, the judge used the term "seaward portion" rather than "flats," "beach," or "shore." He did so because of the plaintiffs' claim of a "right to use not only the beach, but also a portion of [Johnson's] upland property (the portion shoreward of her dune [snow] fence)." As the judge explained, "[i]n Massachusetts law, the terms 'flats,' 'beach,' and 'shore' are synonymous and mean "all the ground between the ordinary high water mark

---

[7]As shown on the 1924 plan, lot 10 is a waterfront lot directly south of lot 11. Lot 40 is directly behind lot 10 and directly south of lot 39.

and low water mark.' *Storer* v. *Freeman*, 6 Mass. 435, 439 (1810). 'Upland' is the area above the high water mark. *Id.*"

None of the parties protests the judge's use of the term "seaward portion" or complains about his determination, based upon his consideration of precedent, scholarly articles, and the testimony of an expert, that the "high water mark" and the "low water mark" were to be measured in accordance with the objective, relevant, standardized, and publicly available data compiled from survey stations established by the Federal government and located throughout the country, that is, National Geodetic Vertical Datum (NGVD).[8]

a. *Extent of Johnson's property.* As explained in part 1, *supra*, Johnson's property is composed of two parts, that is, the Williams parcel (lots 11 and 39, seaward) and the Houghton parcel (lots 10 and 40, seaward). These lots were originally owned by Smith. There is no need to look to historical considerations to determine whether Smith owned the tidal flats to those lots by virtue of a colonial ordinance. See *Pazolt* v. *Director of the Div. of Marine Fisheries*, 417 Mass. 565, 570 (1994) ("The Colonial Ordinance of 1641-1647 established that a person holding land adjacent to the sea shall hold title to the land out to the low water mark . . .").

Because there is no evidence of any prior severance of the flats from the upland, and the plaintiffs do not identify any other owner of the flats, we presume, as did the judge, that Smith owned the upland and the flats. As the Supreme Judicial Court stated, *id.* at 570-571:

> "The 'presumption of law is, that title to the flats follows that of the upland on which they lie, and proof of title to the upland establish[es] a title to the flats.' . . . '[A]n owner may separate his upland from his flats, by alienating the one, without the other. But such a conveyance is to be proved, not presumed, and therefore ordinarily proof of the title in the upland thus bounded carries with it evidence of title in the flats.' . . . 'Since the passage of the [colonial] ordinance, a grant of land bounding on the sea shore carries the flats in the absence of excluding words.' " (Citations omitted).

[8] Two such survey stations are located in Plymouth and Dennis harbors.

We take up first Smith's conveyance of lots 11 and 39 to Williams by deed dated February 14, 1923, in which he described the property conveyed to her as beginning and ending at the "highwater mark." Although Smith could have severed the flats from the upland in his conveyance to Williams, such a severance would had to have been expressly made through the use of "excluding words." *Ibid.* Smith made no such express severance of the flats from the upland.

Five months later, by deed dated July 19, 1923, Smith conveyed to Houghton most, if not all, of his remaining land, including lots 10 and 40, describing the seaward boundary of the conveyed property as "to the highwater mark." Smith expressly reserved a right of way over the property, but he made no express severance of the flats from the upland.

As noted by the judge in his memorandum of decision, terms such as "on the beach," "by the flats," "on the shore," and "by mean high water mark" are not absolute indicatives of an intent to sever the flats from the upland. Rather, "[t]he basic principle governing the interpretation of deeds is that their meaning, derived from the presumed intent of the grantor, is to be ascertained from the words used in the written instrument, construed when necessary in light of the attendant circumstances." *Sheftel* v. *Lebel*, 44 Mass. App. Ct. 175, 179 (1998). The "attendant circumstances" that led the judge to conclude that Smith conveyed to Williams and Houghton all his rights to the beach are as follows.

Smith's conveyance to Houghton was made just five months after his conveyance to Williams, and both deeds were recorded on the same day. Because neither deed contained an express reservation of rights in the flats, it is presumed that Smith conveyed to each all that he had, including the flats. Smith not only failed to reserve any right in the flats in his deeds to Williams and Houghton, but there was nothing to show that at any time thereafter, Smith claimed a fee or other interest in them. Moreover, by carefully delineating the line of property conveyed to Houghton as landward around the parcel previously conveyed to Williams, Smith demonstrated that he had granted to her the same full measure of beach rights.

There is reference in Smith's deeds both to Williams and to Houghton to a "stake and stone" at or near the high water

mark. The judge reasoned that because of tidal action, Smith could not have intended to use the "stake and stone" as the waterside property boundary. Rather, as put by the judge, "[t]he 'stake and stone,' installed shoreward of the water line, was obviously placed as an assured permanent reference point for the purpose of the critical measurement of lot *width.*" We see no error in the judge's reasoning, which we adopt as our own, that led him to conclude that Smith's conveyance to Williams included the beach, as did his conveyance to Houghton of most, if not all, of his remaining land.

There remains the question whether lots 10 and 40, created by Houghton after Smith's conveyance to him, and which Houghton subsequently conveyed to Johnson's predecessor in title, the Liberatores, also included the beach. We again adopt and take as our own the judge's reasoning and conclusions on this issue.

As with the Smith to Williams conveyance, our starting point is the judge's conclusion that Smith's conveyance to Houghton included the beach on those lots fronting on the sea and the presumption that in the absence of an express reservation to the contrary, Houghton conveyed to the Liberatores all that he owned. *Pazolt* v. *Director of the Div. of Marine Fisheries*, 417 Mass. at 570-571. That conclusion led the judge to examine Houghton's deed to the Liberatores construed in light of the circumstances attending that conveyance. *Sheftel* v. *Lebel*, 44 Mass. App. Ct. at 179.

Houghton's 1964 deed to the Liberatores comprehended "lots #40 and #10, and a rectangular piece thirty (30) feet wide more or less by fifty eight (58) feet long lying directly between #10 and the High Water Mark." The deed specifically described the shoreward boundary as "[from] the N.W. corner of lot #10, thence straight on westerly a distance of thirty (30) feet to the High Water Mark at a stake, thence southerly along the H.W. mark a distance of fifty eight (58) feet to a stake, thence easterly a distance of thirty feet (30) more or less to the S. West corner of lot #10," with specific reference to the 1924 recorded plan.

Finding Houghton's reference to the 1924 plan "particularly instructive," the judge observed that "[n]owhere on the 'beach' side of that plan is there any indication that [Houghton] was

retaining the ownership of any property shoreward of the high water mark," and that Houghton's use of "stakes" at the high water mark was "*not* to limit the grant to that stake, but simply 'as the nearest permanent object, and the nearest point at which a permanent monument could be fixed, it being inconvenient to fix a permanent bound mark in the water, or upon the precipitous banks.' *Inhabitants of Ipswich*, [13 Pick. 431, 437 (1832)]." The judge found further support for this reasoning in *Cold Spring Iron Works* v. *Inhabitants of Tolland*, 9 Cush. 492, 496 (1852).

Our review of the exhibits, conducted in the light of controlling precedent, shows that we have no basis for disturbing the judge's conclusion that "Johnson owns the land seaward of her home to the NGVD mean low water elevation." Our conclusion on this point requires us to consider the plaintiffs' claims of right to the use of the property in dispute by reason of implied and prescribed easement rights.[9]

b. *Implied easement rights.* Although all the plaintiffs own

---

[9]It appears from the judge's memorandum of decision that he analyzed the claims of forty of the plaintiffs as asserting a "common scheme implied easement." He identified those plaintiffs as Nancy Houghton; Beth Grega; Norma I. Miller; H. Edward Jans; Caroline Jans; L. Peter Coy; Arlene Coy; Billy Hardy; Bud Bay, LLC; Robert Potter; Rose Marie Potter; Richard Profio; Carol Profio; Nancy W. Apgar; James E. Durfee; James Hunt; Judith Ide; Audrey Spalding; Kenneth W. Spalding, Jr.; Nicholas Bonadies; Heidi Bonadies; Raymond Brodeur; Alfred Beaulieu; John Seliga; Deborah Seliga; Prudence Kerry; Helen D. Crooke; Kenneth D. Crooke; Jennifer H. Fulcher; Lisa A. Melendy; Robert Beachy; Elizabeth Beachy; Margot Wohadlo; Richard Tarca; Sara Shannon-Tarca; Paul N. Meyer; Lola J. Meyer; W. Scott Kerry; Anthony Catalano; and Heidi Catalano.

The judge then identified thirteen plaintiffs as claiming an express or implied easements arising out of language in their deeds granting them the right to use one or more of the ways shown on the 1924 plan, two of which are described as leading to the beach. These thirteen plaintiffs and the lots they own as shown on the 1924 plan are: Nicholas and Heidi Bonadies (lots 55 and 76); Richard and Carol Profio (lots 56 and 75); Robert C. and Rose Marie Potter (lots 57 and 58); W. Scott Kerry (lots 73 and 74); Judith Ide and Audrey Spalding (lots 96 & 97); Richard Tarca and Sara Shannon-Tarca (lot 89 as well as a portion of lot 88); and John and Deborah Seliga (lot 105).

In their appellate brief, the plaintiffs combine the two groups and argue that the fact that some of the plaintiffs have language in their deeds granting them the right to use ways to the beach is another factor to be considered in determining whether Houghton intended all owners of the lots depicted on the 1924 plan to have an implied easement to use the beach of lot 10.

lots depicted on the 1924 plan, none of the plaintiffs' lots fronts the beach. They argue that the 1924 plan, and the circumstances of Houghton's conveyances of the lots so depicted, establish that he intended to create a summer community where all lot owners could use the beach, including the beachfront property of lot 10, which now forms a portion of Johnson's property.

The plaintiffs' claim of an implied easement is based in large measure on *Reagan* v. *Brissey*, 446 Mass. 452 (2006), a case involving an 1872 subdivision plan of land situated to the east of Vineyard Haven Harbor and Crystal Lake in the town of Oak Bluffs on Martha's Vineyard. The plan depicted over 900 lots, all but four of which were numbered, regularly shaped, and of the same size. The four lots in question were larger, unnumbered, irregularly shaped, dispersed over the subdivision, and were designated on the plan as parks. *Id.* at 453. The dispute was between owners of lots shown on the 1872 plan, who claimed an implied easement to use the lots identified as parks, and the defendants: the town of Oak Bluffs, which had taken the four parks in question in 1996 for nonpayment of real estate taxes; the owners of the equity of redemption in the parks, who sought to pay the owed taxes and to redeem some of the parks by selling one of them; and the real estate agency through which the owners intended to sell one of the park lots to a buyer for the purposes of constructing a residence. *Id.* at 452 n.2, 454-455.

The judge below relied on the following language from *Reagan* v. *Brissey*, *supra* at 458, in considering the plaintiffs' claims of implied easement:

> "The origin of an implied easement whether by grant or by reservation . . . must be found in a presumed intention of the parties, to be gathered from the language of the instruments when read in the light of the circumstances attending their execution, the physical condition of the premises, and the knowledge which the parties had or with which they are chargeable. A plan referred to in a deed becomes a part of the contract so far as may be necessary to aid in the identification of the lots and to determine the rights intended to be conveyed. Further, it is well established that where land is conveyed with reference to a plan, an easement . . . is created only if clearly so intended

by the parties to the deed. The burden of proving the existence of an implied easement is on the party asserting it." (Citations and quotations omitted.)

In *Brissey, supra.* at 453-461, factors that led the court to conclude that the lots in question were burdened by implied easements in favor of the plaintiffs included the following: the 1872 plan specifically labeled the four lots as "parks"; the wording of the advertisements for the sale of the subdivision lots poetically suggested the existence of parks for use by all owners of the subdivision lots; the lots being sold were so small that their owners could not enjoy the recreational use of Crystal Lake without access through the parks; and, of significance, the parks and avenues laid out in the plan subsequently were sold as separate and distinct units from the other lots and at a significantly lower price, which indicated that they had little market value as land that could be developed.

None of the factors in *Brissey* exists in the case before us. There were no advertisements for the sale of the lots before us suggesting a "community beach." There is nothing on the 1924 plan designated or labeled "beach," "community beach," or anything comparable. Moreover, the plaintiffs' affidavits fail to make any showing that Houghton ever promised a beach community to them or their predecessors in title.

Further, none of the plaintiffs' deeds makes reference to a "community beach." As observed by the judge below, "There is . . . no discernable pattern in the language of [Houghton's] inland property deeds that mention the beach (or, to be more precise, 'ways' to the beach), and most of the inland property deeds . . . have no reference to the beach at all."

In making this observation, the judge was aware of the fact that the deeds of thirteen plaintiffs established their right to use one or more of the ways shown on the 1924 plan, two of which are described as "leading to the beach." Nonetheless, the judge concluded that these deeds were insufficient to show any discernable pattern in the language of Houghton's deeds from which it reasonably could be inferred that he intended to create a "community beach" or to convey to the back lot owners a right to use the beach. As the judge pointed out, any beach

rights Houghton might have granted could not include all of Kingsbury Beach for the reason that he never owned the Williams parcel and its associated beach, that is, the beach immediately south of Kingsbury Beach Road. Rather, Smith conveyed that parcel to Williams in 1923, several months prior to Smith's conveyance to Houghton of the neighboring land. Moreover, by the time Houghton conveyed the particular lots with deeds granting a right of way "leading to the beach," he had already filed the 1924 plan and had conveyed numerous other lots and the beach areas that they fronted.

As further support for their claim of implied easement rights, the plaintiffs point to their affidavits attesting to their long-standing use of the disputed beach area. However, their argument, as we understand it, proceeds on the basis of a long-standing use of an *existing* implied easement by the affiants. Because we agree with the judge's analysis and conclusion, based upon the undisputed facts before him, that none of the plaintiffs have an implied easement to use Johnson's beach property, we see no need to consider this argument.

c. *Prescriptive easement rights.* The plaintiffs' claims of prescriptive easements in the entire beach area fronting Johnson's property stems from their use of it during the years that it was owned by Jane Liberatore, Johnson's predecessor in title. As stated by the judge in his comprehensive and detailed memorandum of decision, each plaintiff has the individual burden of establishing a prescriptive right of use in the beachfront of lots 10 and 11. See *Garrity* v. *Sherin*, 346 Mass. 180, 182 (1963); *Ivons-Nispel, Inc.* v. *Lowe*, 347 Mass. 760, 761-762 (1964); *Stagman* v. *Kyhos*, 19 Mass. App. Ct. 590, 593 (1985).

In *Boothroyd* v. *Bogartz*, 68 Mass. App. Ct. 40, 43-44 (2007), we stated that G. L. c. 187, § 2, requires that persons show by clear proof that they or their predecessors have used property in which they claim a prescriptive easement "in a manner that has been (a) open, (b) notorious, (c) adverse to the owner, and (d) continuous or uninterrupted over a period of no less than twenty years." While an owner's express or implied permission for claimants' use of his property defeats claims of adverse possession, see *Spencer* v. *Rabidou*, 340 Mass. 91, 93 (1959), claimants are aided in meeting their burden of proof by a pre-

sumption. As stated in *Ivons-Nispel, Inc.* v. *Lowe*, 347 Mass. at 763:

> "Implied acquiescence is not necessarily the same as permission. *In re Rawlins Merc. Co.*, 251 Fed. 164, 166, 169 (S.D. Ga.). See *Robert* v. *Perron*, 269 Mass. 537, 541. On the contrary, adverse possession may exist where there is possession with the forbearance of the owner who knew of such possession and did not prohibit it but tacitly agreed thereto. *Sargent* v. *Ballard*, 9 Pick. 251, 254. *Myron* v. *Smith*, 117 Cal. App. 355, 362. . . . '[W]herever there has been the use of an easement for twenty years unexplained, it will be presumed to be under claim of right and adverse, and will be sufficient to establish title by prescription . . . unless controlled or explained.' *Flynn* v. *Korsack*, 343 Mass. 15, 18, and cases cited therein."

The judge here began his analysis of the plaintiffs' claims of prescriptive easement rights by setting out a correct statement of the law to be applied to the facts as they appeared in the materials before him on the cross motions for summary judgment:

> "Easements by prescription may be established in either of two ways: (1) by use with knowledge on the part of the owner, whose land is used, that the person using his land claims a right to use it, or (2) by a use so open and notorious that knowledge of a claim of right will be presumed. L. Jones, A Treatise on the Law of Easements, Baker, Voorhis & Co., New York 1898 . . . § 266, p. 220. Permission by the owner — even *implied* permission — negates the claimant's 'adversity,' but the owner's acquiescence to a claimant's clearly adverse acts does not. See Jones on Easements, § 282, pp. 232-233; *Ivons-Nispel, Inc.* v. *Lowe*, 347 Mass. 760, 763 (1964)."

His application of the law to the undisputed facts led him to conclude:

> "Whether analyzed as 'implied permission,' or simply as a matter where the conduct in question was insufficiently adverse to put the owner on notice of a claim of right, none of the plaintiffs [has] established a prescriptive easement in [Johnson's] beach or other land. No one made an explicit claim of right. No one erected a structure or staked

a claim to a particular area. All moved up and down the beach, sometimes in the disputed area and sometimes not. [Liberatore] moved among them, seeing them as friends rather than claimants. It was, in short, 'neighborly accommodation' rather than a prescriptive claim."

The plaintiffs argue that the judge's decision is erroneously based upon "new heightened standards for prescriptive easements" and the "creation of a new legal principle of 'neighborly accommodation.' " Rather than focus on the judge's terminology, we look to his application of the law to the undisputed facts as they appeared in the materials submitted by the parties on the cross motions for summary judgment.

The beach that fronts certain subdivision owners' property, such as Johnson's, is not a public beach. As described in the affidavit of the town's chief of police, lot 11 abuts public property, that is, the town landing and the public beach located at the end of Kingsbury Beach Road. However, the boundary between lot 11 and the town landing and public beach is neither readily discernable nor capable of being easily marked. Although the town would occasionally rake seaweed from Kingsbury Beach, it had no rights in the beach area beyond the town landing. Nor were there indicia of public use, such as the availability of parking or other public facilities, at the landing or anywhere along Kingsbury Beach. Compare *Puffer* v. *Beverly*, 345 Mass. 396, 398 (1963) (city's prescriptive easement rights to private beach area based on evidence of regular mooring of boats and city's cleaning of beach as well as placement of trash barrel at location in dispute); *Daley* v. *Swampscott*, 11 Mass. App. Ct. 822, 825, 828-829 (1981) (town's use found to be adverse based on evidence that in summer it raked and cleaned beach seven days a week, provided lifeguards, maintained police patrols along beach, placed and maintained signs setting out rules and regulation concerning use of beach, and removed fences erected by persons claiming private ownership of disputed area).

No one on appeal challenges the fact that tidal action makes any attempt to fence off or enclose Johnson's beachfront futile and that but for a dune fence constructed by Liberatore at the foot of the dunes located back from the highwater mark on lots 10 and 11, Johnson's beachfront is open and unenclosed. It ap-

pears from the plaintiffs' affidavits that many of them and their predecessors in title were friends or acquaintances of Liberatore while others acknowledged that they had never met her.[10]

The plaintiffs, collectively referring to themselves in their brief as "the beach users," attested to their and their predecessors' use for more than twenty years of "all" Kingsbury Beach, including the seaward portion of Johnson's property up to the dune fence, for customary beach purposes.[11] See, e.g., *Labounty v. Vickers*, 352 Mass. 337, 348 (1967). It also appears from some of the plaintiffs' affidavits that there were about eight "beach users" who engaged in activities on the seaward portion of Johnson's property that were different or distinct from those customary beach activities described in *Labounty v. Vickers, supra*. As related in some of the affidavits, one of the plaintiffs once hosted a wedding attended by seventy-five guests, another staged firework displays on the Fourth of July for fifteen years, beginning in approximately 1991, five would sometimes, over the years, leave either a "small sailboat or sunfish" on the beach "off and on" during the summer months, and yet another would regularly build a fire and toast marshmallows. In addition, according to one affidavit, "Kingsbury Beach has also become a haven for people who for years have come to witness the July 4th fireworks that take place at Rock Harbor."[12] To the extent any of this

---

[10]In their brief, the plaintiffs point out that the judge "focused only on a small subset of the [plaintiffs'] affidavits" and claim that such a "sampling" was an "inappropriate" basis for his rejection of the substance of all the plaintiffs' affidavits. In considering the plaintiffs' affidavits, however, the judge noted that he was aware of their "differences . . . particularly in the duration, timing and intensity" of the claimed use as well as the "precision with which the area, duration, timing and intensity of use is identified." He nonetheless concluded that those differences were immaterial to the bases for his decision because, as he explained, he instead chose to "focus on the strongest of [the] plaintiffs' affidavits and analyze why, even on the plaintiffs' best cases (the plaintiffs with the longest, most continuous, and intense use), a prescriptive easement was not established."

[11]Although some plaintiffs described their use of Kingsbury Beach as "seasonal" or limited to weekends, the judge noted that "[m]ere 'seasonal' use does not defeat a claim for prescriptive easement rights. See *Kershaw v. Zecchini*, 342 Mass. 318, 321 (1961). See also *Bodfish v. Bodfish*, 105 Mass. 317, 319 (1870) (' "[C]ontinuous use" does not necessarily mean "constant use" . . .') . . . ." See also *Lebel v. Nelson*, 29 Mass. App. Ct. 300, 302 (1990).

[12]As further stated by this plaintiff in his affidavit, "[t]he town has always

information was based upon hearsay, the judge well understood that it was within his discretion to refuse to consider it. See note 3, *supra.*

Liberatore's affidavit and deposition testimony largely tracked the facts set out in the plaintiffs' affidavits. She described the subdivision as a friendly community comprised of neighbors "always ready to help in an emergency" and related that she regarded her beach frontage shoreward of her dune fence as a "community resource . . . for everyone's use." Liberatore also acknowledged her awareness that acquaintances, friends, and neighbors, all owners of subdivision lots without beach frontage, engaged in normal beach activities along all of Kingsbury Beach, including her beach frontage, which she understood to end at the highwater mark. She related that whenever she chose to use her property while any of the plaintiffs or their predecessors in title were also using it, she would sit among them and socialize. She described how her children and grandchildren romped on the beach frontage of lots 10 and 11 as well as all of Kingsbury Beach with the children and grandchildren of other subdivision lot owners.

As also set out in the summary judgment materials, Liberatore described how she exercised control over the use of her beachfront in matters of importance and concern to her. Although the plaintiffs seek rights limited to that portion of her property situated seaward from the dune fence, their self-imposed limitation does not preclude our consideration of the undisputed fact that Liberatore exercised control over her property to the extent she believed necessary. Specifically, she erected a fence to keep people off the dunes situated along her beachfront for purposes of preserving and protecting their natural beauty. When people chose to ignore the fence and go onto her enclosed dunes, she posted "please keep off" signs along the fence.

Liberatore also related that when people ignored her fence and signs, she and her husband would speak to them. They would request the intruders to leave the dunes. When their requests were met with challenges or questions, Liberatore and her husband explained their interest in and desire to protect their dunes. Upon

allowed exception to parking rules for that event and hundreds of people come to spend a few hours of sitting on the beach and watching the splendor of the fireworks. Many people gathered in front of what is now [Johnson's] cottage."

hearing the Liberatores' explanation, the intruders would generally respect their requests and leave the enclosed dune area.

None of the plaintiff "beach users" contest the judge's determination that they "do not . . . nor can they claim on the record [presented] that Liberatore . . . had *actual* knowledge they were making a claim of right to use her land." On that basis, the question before us is whether *each* plaintiff sustained the burden of showing by undisputed facts that his use of the disputed beach area was sufficiently open and notorious as to entitle him to the benefit of the presumption that Liberatore knew that his or his predecessor's use of the area was being made under a claim of right. See *Garrity* v. *Sherin*, 346 Mass. at 182; *Ivons-Nispel, Inc.* v. *Lowe*, 347 Mass. at 761-762; *Stagman* v. *Kyhos*, 19 Mass. App. Ct. at 593.

Our consideration of this question begins with our observation that except for the eight examples of distinct use of Johnson's beachfront by some of the plaintiffs or their predecessors, the plaintiffs' argument concerning their open and notorious use of the area is couched in the collective term of "beach users." However, we see no need to study each of the affidavits submitted by the plaintiff "beach users" in order to determine whether each individual plaintiff or his predecessor in title set out undisputed facts sufficient to satisfy the individual burden of proof. None argues that the judge erred in determining that "[t]he plaintiffs' use of Kingsbury Beach was not confined to the disputed land. They considered *all* parts shoreward of the dunes, up and down the entirety of Kingsbury Beach, to be available for their use."

Aside from the absence of any individual or specific claim of error in the judge's determination, all the plaintiffs argue that each of them is entitled to the benefit of the presumption because the undisputed facts establish that their use of the disputed beach area was open and notorious and that it was "consistent with that of an average landowner and with the nature of the land." See, e.g., *Labounty* v. *Vickers*, 352 Mass. at 348.

Based on the undisputed facts that the disputed beach area abuts public property, that it could not be enclosed from the dunes seaward because of tidal action, that Liberatore had no right to prohibit the plaintiff "beach users" or any one else from exercising their right to fish, fowl, and navigate along the area

between the high and low water marks, see *Pazolt* v. *Director of the Div. of Marine Fisheries*, 417 Mass. at 571, and that the "beach users' " use of the disputed area was no different in nature from their use of all Kingsbury Beach, we conclude that each plaintiff was required to show more than a collective but individually sporadic and nonexclusive use of the disputed area, one of the many lots fronting on Kingsbury Beach, in order to be entitled to the benefit of the presumption. See *Kilburn* v. *Adams*, 7 Met. 33, 39 (1843), a case involving prescriptive easement claims in open and unenclosed property in which it was held that because of the difficulty in overseeing or monitoring the use of open and unenclosed land, claimants of adverse rights in such property must show "some decisive act, indicating a separate and exclusive use, under a claim of right . . . open and ostensible, and distinguishable from that of others." See also *Sprow* v. *Boston & Albany R.R.*, 163 Mass. 330, 339-340 (1895).

As for the eight examples of alleged unusual or distinct acts conducted on the disputed beachfront area, we think they were, at best, infrequent and isolated incidents by a small number of certain subdivision residents rather than examples of occurrences from which it could be presumed that Liberatore knew that the actors were conducting these activities under claims of right. Compare *Puffer* v. *Beverly*, 345 Mass. at 404; *Daley* v. *Swampscott*, 11 Mass. App. Ct. at 829.

Moreover, we find no force in the plaintiffs' argument that the judge created a new and heightened standard for those presenting prescriptive easement claims by requiring the plaintiff "beach users" to show that a permanent structure had been erected by any of their number on the disputed area. It is apparent from the judge's memorandum of decision that his statement concerning permanent structures was no more than an example or illustration as to how those claiming prescriptive rights could meet their burden of showing entitlement to the benefit of the presumption of Liberatore's knowledge that use of the beach was being made under claim of right.

Even were we to assume for purposes of decision that *each* plaintiff sustained his burden of indisputably showing that use of Liberatore's property was so open and notorious as to entitle the plaintiff to the benefit of the presumption, our conclusion

would only shift to Johnson the burden of rebutting that presumption with undisputed facts demonstrating that each plaintiff's use of Liberatore's beach area was with her implied permission rather than her acquiescence. See *Spencer* v. *Rabidou,* 340 Mass. 91, 93 (1959) (express or implied permission defeats claims of adverse possession). See also *Ivons-Nispel, Inc.* v. *Lowe,* 347 Mass. at 763. In taking up the plaintiffs' arguments on the question of acquiescence or implied permission, we see no need to repeat the undisputed facts.

The plaintiffs make much of the judge's description of the Liberatores' lack of objection to the plaintiffs' use of the disputed beach area as a "neighborly accommodation." Their argument is that the judge applied a new legal principle to bolster his conclusion that none of the plaintiffs established a prescriptive easement in the beach. To be sure, the judge did state in the final sentence of his memorandum of decision that Liberatore's allowance of the plaintiffs use of the beach was "in short, a 'neighborly accommodation' rather than a prescriptive claim." That is not to say, however, that the judge applied a new principle of law to the undisputed facts.

In his memorandum of decision, the judge did cite to and quote from Jones, Easements, § 289, at 238 (1898), which states that "[t]he law is not meant, and should not be interpreted, to discourage 'neighborly accommodation.' " However, the judge immediately thereafter also cited to and quoted from the earlier statement set out in Jones, *supra* at § 285, at 235, which provides, "To prove the use to be adverse, it is not sufficient to show an intention alone to claim it as of right, but that intention must be manifest *by acts of clear and unequivocal character* that notice to the owner of the claim might be reasonably inferred" (emphasis added by judge).

The plaintiffs also contend that any notion that Liberatore impliedly permitted their presence on her property was rebutted by her testimony which they relate as her "uncommunicated belief that the public had a right to use" her beach property. As we read the summary judgment materials, Liberatore's "uncommunicated belief" was that her beach property was a "community resource," that community being comprised of her friends and neighbors within the subdivision.

Although the undisputed materials show that while the plain-

tiffs were using the beach frontage as well as enjoying Liberatore's society and companionship, she exercised her right of control over that property whenever it was being used in a manner she found objectionable. None of the plaintiffs challenged her right to do so.

In our view, the plaintiffs' arguments are defeated by the decisive and undisputed facts that (1) lot 11, which abuts a public beach, cannot be enclosed; (2) the plaintiffs used all of Kingsbury Beach for customary beach activities and did not confine themselves to the beach areas of lots 10 and 11; (3) none of the plaintiffs who used the disputed beach areas while enjoying Liberatore's society and companionship ever informed her that the plaintiffs' use was being made under a claim of right; (4) the eight distinct acts relied upon by the plaintiffs were no more than isolated incidents rather than attestations of activities continuously conducted for the prescribed twenty-year period; (5) while Liberatore enjoyed the society and companionship of the members of the subdivision on the disputed beach areas whenever she was present, she did not hesitate to exercise control of her beachfront property on those occasions she thought necessary to do so; and (6) no plaintiff ever challenged her right to exercise control of the plaintiffs' use of the disputed beach areas.

Applying the controlling law to the undisputed facts, we see no error in the judge's conclusion that "[w]hether analyzed as 'implied permission,' or simply as a matter where the conduct in question was insufficiently adverse to put the owner on notice of a claim of right, none of the plaintiffs [has] established a prescriptive easement in . . . Johnson's beach or other land."

5. *Conclusion.* It follows from what we have said that Johnson owns the land seaward of her home to the mean low water mark, that none of the plaintiffs has any right to use that portion of Johnson's property, and that the plaintiffs have the right to fish, fowl, or navigate between the mean high and mean low water elevations of the property. Accordingly, the judgment of the Land Court is affirmed.

*So ordered.*

Houghton *v.* Johnson.

APPENDIX.

Ida Z. Aho; Fred Daum; Nancy W. Apgar; Harley H. Apgar and James W. Apgar, as trustees of the Nancy W. Apgar Trust; Robert D. Beachy and Elizabeth Beachy, as trustees of the Robert D. Beachy and Elizabeth L. Beachy Nominee Trust; Alfred G. Beaulieu, as trustee of the Beaulieu Funding Trust; Nicholas R. Bonadies; Heidi P. Bonadies; Raymond A. Brodeur; Bud Bay, LLC; Paul H. Carlson; Suzanne C. Carlson; Anthony F. Catalano; Heidi A. Catalano; Dominick Catalano; Mary Lou Catalano; Michael A. Cicalese; L. Peter Coy; Arlene Coy; Prudence Ann Kerry; Helen D. Crooke; Kenneth W. Crooke; James A. Donovan; Patricia R. Donovan; DPO, LLC; James E. Durfee; Sharon J. Friedman; S. Martin Friedman; Jennifer H. Fulcher; Lisa A. Melendy; Gary J. Gagnon; Diane E. Gagnon; Beth Grega; William Hardy; James F. Hunt; Judith H. Ide; Kenneth W. Spalding, Jr.; Audrey I. Spalding; H. Edward Jans; Caroline G. Jans; Russell M. Keith; Susan L. Keith; W. Scott Kerry; Thomas J. Lardner; Anne Jeanne Lardner; Estelle R. Lussier, as trustee of the Lussier Family Nominee Trust; Paul N. Meyer; Lola J. Meyer; Norma I. Miller; Barbara A. Schmidt and Cheryl A. Parker, as trustees of the Barbara A. Schmidt Revocable Trust; Diane E. Pavelchak, as trustee of the Diane E. Pavelchak Revocable Living Trust; Michael K. Pavelchak, as trustee of the Michael K. Pavelchak Revocable Living Trust; David S. Plantier; Tracey Plantier; Carol A. Potter; John V. Potter; Robert C. Potter; Rose Marie Potter; Frances Powell; Glenn Powell; Mary Varisco; Phil Varisco; Richard A. Profio; Carol M. Profio; Susan Saunders; Robert V. Saunders; John J. Seliga; Deborah Seliga; Richard Tarca; Sara Shannon-Tarca; Elsie M. Thayer, as trustee of the Thayer Revocable Trust; Margot C. Wohadlo; and Leonard R. Wohadlo.