Kenton-Walker, Janet, J.
This is a dispute between neighbors regarding the boundary line between their respective properties. The plaintiffs James and Helen Queenan (the “Queenans”) commenced this action against the defendants Cecil and Florinda Marchionne (the “Marchionnes”) and Kevin Kiley (“Kevin”) seeking an order declaring they have either acquired title to disputed land through adverse possession, or the right to use the disputed land pursuant to a prescriptive easement. In addition, the Queenans seek injunctive relief that orders the Marchionnes to remove a fence. The case was tried without a jury. At the close of the plaintiffs’ case, the court dismissed the claims against Kevin upon the defendant’s motion. After trial, the parties submitted proposed findings of fact, which the court has considered. To the extent they are not found by the court, they are deemed denied.
FINDINGS OF FACT
Based upon the credible evidence introduced at trial and the reasonable inferences therefrom, the court makes the following findings of fact.
Cecil Marchionne (“Cecil”) and his wife, Florinda Marchionne (“Florinda”), purchased 20 Phillips Road, Sagamore Beach, Bourne, Massachusetts (the “Marchionne Property”) in 1965 to use as a seasonal summer home. Cecil passed away on April 18, 2009, leaving Florinda as the sole owner of the property.[3] James Queenan (“James”) and his wife, Helen Queenan (“Helen”), purchased property located at 10 Phillips Road, Sagamore Beach, Bourne, Massachusetts (the “Queenan Property”) on May 28, 1981, for their seasonal summer home. The two properties are adjacent to each other, with the easterly border of the Queenan Properly contiguous to the westerly border of the Marchionne Property.
The Queenans purchased their property from Frederick and Anna Joyce (the “Joyces”). Just prior to closing with the Queenans, the Joyces learned that the westerly boundary of the Marchionne Property ran through a portion of the Joyces’ house. To rectify the problem, the Marchionnes conveyed a triangular piece of property, consisting of 441 square feet, to the Joyces that changed the boundary line between the two properties. The Joyces then conveyed 10 Phillips Road to the Queenans, which included that additional 441 square foot triangular parcel. The deeded easterly property line that runs alongside the Queenans’ house is extremely close to the house and at the southeast corner of the house appears to be within inches of the building. Because the deeded property line runs within inches of the easterly side of the Queenans’ house, the Queenans, and any contractor performing services, have always had to enter onto the Marchionne Property in order to access the easterly side of the house, so as to perform regular maintenance,[4] as well as replace windows, paint, and make roof repairs. The Queenans have done so openly, *428 continuously, and without seeking permission of the Marchionnes from 1981 until the end of 2006.
Since before 1981 and continuing up to the present day there is a hedge consisting of rosa rugosa bushes that separates the front yards of the two properties.[5] Between 1981 and through at least 2004, the hedge began approximately six feet south of Phillips Road and ran in a southerly direction to the northeast corner of the Queenans’ house, where it then continued along the easterly side of the Queenans’ house, ending approximately midway down the house. Based on the recorded deeds, the property line is to the wrest of the hedge placing the entire hedge on the Marchionne Property.
Until around 2003, the rosa rugosa bushes were healthy and in the summer the bushes grew into a hedge that was around five feet tall and veiy thick; however, there were sizeable gaps between the bushes near the northeast corner of the Queenans’ house, which allowed the Queenans, and the various contractors hired by the Queenans, to access the easterly side of the house and the Queenans’ backyard.[6] Although the Marchionnes’ daughter, Cecile Kiley (“Cecile”), testified there were no sizeable gaps in the hedge until after 2000, the court does not credit this testimony since photographs support a finding that gaps existed much earlier than that. Beginning in 2003 the hedge began to deteriorate in health and several bushes died. Although the Queenans planted some new bushes, they also died, and by 2006 the once thick hedge became quite sparse, consisting of only a few bushes.
From the time the Queenans purchased their property until late 2006, James regularly maintained the rosa rugosa hedge, which consisted of pruning back the eight inches of growth on both sides of the hedge in the fall, removing dead branches and honeysuckle vines during the summer months, as well as routine clipping in the summer. In addition, the Queenans mowed the lawn up to the hedge, and at some points between the bushes, as well as along the easterly side of their house directly next to the bushes.
During the 1980s Cecil and Kevin, Cecile’s husband, also did some maintenance to the hedge by pulling out honeysuckle vines and removing dead wood. They also mowed the lawn on their side of the hedge in the front yard. After Cecil stopped coming to the Marchionne Property,[7] Kevin continued to do some work on the hedge and to mow the lawn. At some point both the Queenans and Marchionnes hired the same landscaper who mowed the lawn on both sides of the hedge, but James continued to maintain the hedge. While Cecil and Kevin did some work on the hedge, the court finds that the Queenans did more to maintain the hedge between 1981 and 2006 than the Marchionnes. The court also finds that both the Queenans and Marchionnes acted as if the rosa rugosa hedge represented the boundary between the two front yards. The Marchionnes never used or maintained the land on the Queenan side of the hedge, and the Queenans exclusively used and maintained the land up to the hedge on their side, considering it part of their front yard.
Between 1981 and 2006 a wooden fence, belonging to the Marchionnes, separated the two backyards of the properties. This wooden fence consisted of two sections of a stockade fence and one section of a split rail fence. Where the split rail fence ended, there was open lawn, which was the access point to the Queenan’s backyard from the easterly side of their house. Since 1981, the Queenans maintained a garden in their backyard along the easterly side of the fence, which included a mulched flowerbed, various perennials, and some bushes. At its most northerly point, the garden ended where the split rail section of the wooden fence ended. In the back southeast corner the Queenans had a brush and compost pile. On the Marchionne side of the wooden fence there were various bushes that ran alongside the fence, including a rhododendron bush that also encroached onto the Queenan side of the split rail portion of the fence.
Roland Chevrefils, Jr. (“Chevrefils”) was a contractor who provided various handyman services to both the Queenans and the Marchionnes. Chevrefils worked for the Queenans since they purchased their home in 1981 up until 2010. His work included opening the Queenans’ home in the spring and closing it in the fall, as well as replacing the windows, building additions onto the kitchen and dining room, painting the outside of the house, putting up a trellis alongside the Queenans’ deck in the backyard, performing roof repair, and building an outdoor shower in the backyard. Chevrefils also worked for the Marchionnes for over twenty years, which included opening and closing the Marchionnes’ home in the spring and fall. Chevrefils had keys to both homes.[8] On two separate occasions in the mid-1990s, Chevrefils repaired fallen portions of the stockade portion of the Marchionnes’ fence, but never changed the location of the fence or added any additional sections.
Whenever work needed to be done on the easterly side of the Queenans’ home or in the backyard, Chevrefils used the west side of the Marchionne Property, as this was the only way he could perform work on the east side of the Queenans’ home.[9] In particular, because the only access to the water shutoff valve to the Queenans’ home is on the easterly side of the house, Chevrefils had no choice but to be on the Marchionne Property in order to be able to turn the water on in the spring and shut it off and drain the water for the winter. In addition, Chevrefils gained access to the Queenans’ backyard by going through the open space between the split rail portion of the fence and the Queenans’ deck (where the trellis had been built), particularly when he needed to get machinery, equipment and construction material into the back yard. Chevrefils credibly testified that because of *429 the sloped terrain and limited space leading to the Queenans’ backyard on the westerly side, it was extremely difficult, and sometimes impossible, to get construction materials, equipment, or machinery into the backyard from the west side. Throughout all the years Chevrefils used the Marchionne Property to access the Queenan Property, neither the Queenans nor Chevrefils ever sought permission from the Marchionnes, nor were the Queenans or Chevrefils told by the Marchionnes they could not use the Marchionne Property to obtain access.[10]
In 2003 the Marchionnes had a survey conducted of their property and the surveyors placed orange painted wooden stakes (“orange stakes”) in the ground marking the lot line between the two properties. The orange stake marking the southwest lot corner of the Marchionne Property was placed approximately one and one-half feet to the west of the old wooden stockade fence, which placed it in the backyard area that had always been used by the Queenans.[11] Stakes were also placed along the easterly side of the Queenans’ house, including stakes at the northeast and southeast corners of the house; however, there was no evidence that stakes were placed in the front yard. While it is not clear when the Queenans became aware of the survey and the placing of the orange stakes, the court finds that prior to 2005 they knew a survey had been done and that the orange stakes purportedly marked the property line. The court further finds that, despite the placing of those stakes, both the Marchionnes and the Queenans continued to use the properties as they always had.
In the late fall of 2006 and early spring of 2007, the Marchionnes erected a fence around their property, including along the property line bordering the Queenan Property. Between the two properties in the front yard, approximately six inches to the east of the deeded property line, the Marchionnes erected a vinyl split rail fence beginning about where the northernmost part of the rosa rugosa hedge started and running southerly to an end point within six inches of the northeast corner of the Queenans’ house. Some rosa rugosa bushes were removed when the fence was erected. This fence prevents the Queenans from having access to the rosa rugosa hedge[12] and, more importantly, prevents them from having access to the easterly side of their house.
In the backyard, the Marchionnes removed the old wooden stockade and split rail fence and erected a new vinyl stockade and split rail fence; however, an additional panel of stockade fence and several additional sections of split rail fence were erected so that the new fence extends across the open lawn area the Queenans used to access their backyard and ends in the midsection of the Queenans’ back deck and trellis, just a few feet from the southeast corner of the Queenans’ house. As a result, the Queenans can no longer access their backyard from the easterly side. Although James testified that the stockade portions of the new backyard fence were installed two feet further west, the court does not credit this testimony and finds that the new stockade fence and one section of the new split rail fence were placed in virtually the same place as the old fence.
RULINGS OF LAW
This court must first determine whether the Queenans have proved by a preponderance of the evidence that they have acquired title by adverse possession to those portions of the land along the boundary line that are now on the westerly side of the fence erected by the Marchionnes, and that they possess a prescriptive easement to the property between the two houses for maintenance and repair purposes, as well as for passage and access to their backyard. If the Queenans have sustained their burden of establishing their property interest, this court must determine if the Queenans’ request for an injunction ordering the removal of the fence installed by the Marchionnes is the appropriate remedy.
I. Adverse Possession: Northwest and Southwest Portions of the Marchionne Property
“Title by adverse possession can be acquired only by proof of nonpermissive use which is actual, open, notorious, exclusive and adverse for twenty years.” Ryan v. Stavros, 348 Mass. 251, 262 (1964). The adverse possessor must use the property “as the average owner would use it, without the consent of the true owner and therefore in actual hostility to him irrespective of the possessor’s actual state of mind or intent.” Kendall v. Selvaggio, 413 Mass. 619, 624 (1992), quoting Ottavia v. Savarese, 338 Mass. 330, 333 (1959). Acts of possession that are “few, intermittent and equivocal” are not enough. Id. The Queenans bear the burden of proving title by adverse possession. Sea Pines Condominium III Ass’n v. Steffens, 61 Mass.App.Ct. 838, 847 (2004).
This court concludes that in the front yard (the northwest portion of the Marchionne Property) the Queenans have acquired title by adverse possession to the portion of the Marchionne Property lying to the west of the rosa rugosa hedge. The Queenans have been using this portion of the Marchionne Property from the time they purchased their property in 1981 until the end of 2006 when the Marchionnes erected a fence along the property line. Specifically, James maintained the rosa rugosa bushes, mowed the lawn in front of the bushes, and considered that area to be part of their front yard. Landscaping activities within an enclosed area have been held sufficient to establish adverse possession of a narrow strip of land, such as the land at issue in this case. See, e.g., Kershaw v. Zeechini, 342 Mass. 318, 320 (1961) (adverse possession found where claimant marked boundary, cleared brush, and used land for exercises and stunts); Lyon v. Parkinson, 330 Mass. 374, 380 (1953) (adverse possession found where claimant cut brush, removed *430 stumps, made rock garden, and installed rip-rap); McNeill v. Miller, 69 Mass.App.Ct. 1114, 2007 WL 2189160, at *1 (2007) (“In a case such as this, involving a narrow strip along a lot boundary, the planting of trees or shrubs and regular performance of general landscape maintenance is sufficient to create a prima facie case of adverse possession, particularly where the area is enclosed” [memorandum and order pursuant to rule 1:28]); Pugatch v. Stoloff, 41 Mass.App.Ct. 536, 540, 544 (1996) (adverse possession found where claimant maintained lawn, privet hedge, and retaining wall). The Marchionnes, however, have never used any portion of the properly west of the rosa rugosa hedge.
The Queenans have also established their right to title by adverse possession of the strip of land in the backyard (the southwest portion of the Marchionne Property) lying to the west of the Marchionnes’ stockade and split rail fences. The Queenans used that strip of land exclusively for over twenly years, having maintained a garden and flowerbed in that area right up to the base of the old wooden stockade and split rail fences. The Marchionnes, on the other hand, have never used any portion of the property located to the west of the fence.
The Marchiounes have not established that the Queenans’ use of the land was permissive. See Ivons-Nispel Inc. v. Lowe, 347 Mass. 760, 763 (1964) (finding implied acquiescence insufficient to constitute permission). Indeed, the Marchionnes also proceeded as though the rosa rugosa bushes represented the boundary between the parties’ front yards, and that their old fence marked the boundary between the parties’ backyards, as they never used or maintained the land on the Queenans’ side of the hedge or fence. See Kendall v. Selvaggio, 413 Mass. 619, 622 (1992) (noting that “permissive use based on a mutual mistake as to the location of a boundary line will not defeat a claim of adverse possession”); MacDonald v. McGillvary, 35 Mass.App.Ct. 902, 902-03 (1993) (adverse possession found where parties mowed lawn and raked leaves on their respective sides of fence under mistaken belief that fence marked boundary). The Queenans’ use of the property was therefore open, notorious, exclusive, and adverse to the Marchionnes for over twenty years, thereby establishing adverse possession of the land.
II. Prescriptive Easement: Side Lawn Abutting the Queenans’ House
As with adverse possession, acquisition of a prescriptive easement requires use of the properly “in a manner that has been (a) open, (b) notorious, (c) adverse to the owner, and (d) continuous or uninterrupted over a period of no less than twenty years.” Houghton v. Johnson, 71 Mass.App.Ct. 825, 835 (2008), quoting Boothroyd v. Bogartz, 68 Mass.App.Ct. 40, 43-44 (2007); see also G.L.c. 187, §2. “[WJhenever there has been the use of an easement for twenty years unexplained, it will be presumed to be under claim of right and adverse, and will be sufficient to establish title by prescription and to authorize the presumption of a grant unless controlled or explained.” Denardo v. Stanton, 74 Mass.App.Ct. 358, 363 (2009), quoting True v. Field, 269 Mass. 524, 528-29 (1930). In contrast to adverse possession, however, a party claiming a prescriptive easement does not need to demonstrate exclusive possession of the land at issue. Labounty v. Vickers, 352 Mass. 337, 349 (1967). The burden of establishing the right to a prescriptive easement falls on the party claiming such rights. Houghton, 71 Mass.App.Ct. at 835.
The court concludes that the Queenans have sustained their burden of establishing their right to a prescriptive easement across the land running along the easterly side of their house. For over twenty years, the Queenans traversed this strip of property along the side of their home to conduct repairs and maintenance on their windows, paint, and roof, and to gain access to their backyard. Annual maintenance of the house included opening and closing it each season, which required access to the easterly side of the house to turn the water on and off and to attach and remove the shutters from the windows. The Queenans’ use of the side lawn for this purpose was continuous, notwithstanding their seasonal absence from the house. See Mahoney v. Heebner, 343 Mass. 770, 770 (1961) (adverse use found continuous despite seasonal absence from summer residence). Accordingly, the Queenans have established their right to a prescriptive easement over the lawn on the westerly side of the Marchionne Property for purposes of maintaining their house.
Based on the rulings of this court, much of the fence installed by the Marchionnes in late 2006 and early 2007 seriously infringes on the Queenans’ property rights. In order to allow the Queenans proper access to and use of their property, those portions of the Marchionnes’ fence that interfere with the Queenans’ rights must be removed.
ORDER
For the foregoing reasons, it is hereby DECLARED and ADJUDGED that:
1. With regard to the front yards, the plaintiffs, the Queenans own, by right of adverse possession, a fee in a 2.5 foot wide by 45 foot long strip of land that begins at the southerly side of Phillips Road at the point of the current record boundary between the Queenan Property and the Marchionne Property and extends south for 45 feet along the western border of the defendant’s current boundary and to a depth of 2.5 feet easterly from said border, then returning north to Phillips Road, and then 2.5 feet west along said boundary to the point of the beginning.
2. With regard to the back yards, the Queenans own, by right of adverse possession, the strip of land between the defendant’s current record boundary *431 and the present existing fence, beginning at the southern border of the defendant’s current record boundary, then extending north along the stockade fence and the first section of split rail fence, and ending at the northerly edge of the end post of the first section of the split rail fence.
3. The Queenans hold a prescriptive easement to pass, with any necessary equipment, onto the defendant’s side yard, located between the Queenans’ house and the defendant’s house and driveway to a depth of 12 feet from the defendant’s record western property line, for purposes of access to and maintenance of the Queenans’ house and property. Such maintenance shall include, but not be limited to, house painting, roof repair or replacement, window repair or replacement, turning off and on the house’s water supply by accessing the crawl space under the house through the door on the easterly side of the house, mowing grass, moving materials from the front of the Queenans’ home to the rear of their home, and installation or removal of screens and boards on the house. Said easement shall begin at a point 30 feet south from Phillips Road along the defendant’s record western property line and shall continue south along said line up to the end post of the southernmost section of split rail fence identified in the preceding paragraph.
4. The defendant shall, within 30 days of final judgment, remove the entire split rail fence that is now located in the front yard.
5. The defendant shall, within 30 days of final judgment, remove the northerly 2 sections of the split rail fence located in the prescriptive easement area described in paragraph 3.
6. The fee and easement rights of the Queenans declared herein shall be owned by them as tenants by the entirety, with right of survival.
7. These findings shall be recorded, without necessity of a new survey, in the Barnstable County Registry of Deeds.

 Even though the Marchionne Property is now solely owned by Florinda, the court will use “Marchionnes” when referring to the defendants.

 Regular maintenance included opening and closing the house each season, which involved putting on and removing shutters from the windows and turning the water on and off. The water shutoff to the Queenans’ house is located in a crawlspace under the house that can be accessed only on the easterly side.

 Rosa rugosa bushes are semi-deciduous bushes that lose most of their foliage in the winter. The bushes bloom all summer.

 Although the Queenans have always been able to access their backyard on the westerly side, that has never been the main access point as the terrain and vegetation makes access difficult, particularly if equipment, machinery, or tools are needed. See infra.

 Florinda testified that she did not visit the Marchionne Property after 1982 and that Cecil stopped going sometime in 1987 or 1988.

 As a result of this litigation, Chevrefils stopped providing services to the Marchionnes, but continued to work for the Queenans.

 The space between the Queenans’ house and the Marchionnes’ garage is approximately twelve feet wide, grassy and slightly sloped down towards the Marchionne Property. When a ladder was needed to access certain parts of the east side windows and roof of the Queenans’ house, the feet of the ladder were often placed right up against the wall of the Marchionnes’ garage in order to maintain a safe and stable angle.

 There was one occasion when Kevin told Chevrefils that he did not want him to park his truck on the lawn area between the two homes, but did not object when Chevrefils parked his buck on the Marchionnes’ driveway while working on the Queenan Property. There was also an occasion when the Queenans asked permission to use the Marchionnes’ driveway so a handicapped guest using a wheelchair could be dropped off closer to the backyard.

 The Marchionnes have never used any portion of the property located to the west of the fence.

 There was no evidence to dispute that the actual deeded property line between the two properties in the front yard places the entire rosa rugosa bush on the Marchionne Property.