AGNES, J.
*731 *820 This is the second appeal arising from a dispute between neighbors over interests in a large beach in Edgartown on Martha's Vineyard (the beach) and the roads leading to it; this appeal is limited to the issue of prescriptive easement rights in the beach itself. The first appeal was heard by the Supreme Judicial Court on direct appellate review. See White v. Hartigan, 464 Mass. 400, 982 N.E.2d 1115 (2013). In that decision, after resolving several legal issues, determining, inter alia, that the plaintiffs have no deeded title to the beach, the Supreme Judicial Court concluded that the decision of the Land Court judge contained insufficient subsidiary findings of fact to allow adequate review of the plaintiffs' claims of a prescriptive easement over the entire beach. The Supreme Judicial Court remanded for further factual findings, stating:
"For the reasons discussed, the record does not contain such subsidiary findings of fact as are necessary to permit adequate review of the judge's conclusion that the [plaintiffs'] use of the beach was not open and notorious, adverse, or for a period of twenty years. It may well be the case that the judge credited some witnesses' testimony, in whole or part, and did not credit that of others, in whole or part, particularly where issues involved extensive contradictory testimony. See Matsushita Elec. Corp. of Am. v. Sonus Corp., 362 Mass. 246, 254, 284 N.E.2d 880 (1972). However, because the decision is generally silent as to such matters, the meager findings do not permit us to infer the credibility determinations the judge may have made.
"We take no view on whether the evidence produced at trial is sufficient to support the conclusion that the [plaintiffs] did not establish a prescriptive easement; we simply require additional findings of fact, based on this evidence, so as to permit an adequate review. See Mass. R. Civ. P. 52 (a) [, as amended, 423 Mass. 1402 (1996)]. Because the findings do not provide us with a 'clear understanding of the judge's reasoning and the basis of his decision,' Rapp v. Barry [398 Mass. 1004,] 1005 [496 N.E.2d 636 (1986) ], we remand for further findings of fact."
White, 464 Mass. at 420, 982 N.E.2d 1115.
*732 By the time the remand order was entered, the original Land Court judge had retired and a different Land Court judge (remand or second judge) was assigned to hear the case on remand. Certain defendants filed a motion for a new trial, contending that because the remand judge did not hear evidence, she was not in a position to assess the credibility of the witnesses who testified at the first trial and, for that reason, could not make the additional findings of fact required by the remand order. The plaintiffs opposed the motion, arguing, in part, that absent an *821 explicit direction from the Supreme Judicial Court to hold a new trial, the remand judge had discretion to decide whether a new trial was necessary. The judge deferred action pending submission of a statement of the plaintiffs' remaining claims on remand, a stipulation of agreed facts, if any, and submission of requested findings of fact and rulings of law from each party. After reviewing those submissions, the judge ultimately concluded that she could comply with the remand order without an evidentiary hearing. After arguments, the judge issued a judgment on the original record.
The original Land Court judge found that the plaintiffs failed to prove they had acquired an easement by prescription because they did not satisfy any of the requirements of a prescriptive easement: their use was neither open nor notorious during the relevant periods, any adverse use was not continuous and uninterrupted for a period of twenty years, and, in any event, their use was permissive. See White, 464 Mass. at 416-418, 982 N.E.2d 1115. On remand, the second judge found that although the plaintiffs' use was open and notorious and was not permissive, the plaintiffs had failed to satisfy the requisite twenty-year time period to acquire an easement by prescription over the whole or any specific portion of the beach.[5] The plaintiffs appeal from the judgment; the defendants urge that we affirm the judgment, but they also challenge the finding that the plaintiffs'
*733 use was not permissive.[6] We affirm in part and reverse in part.
Background. 1. The beach. The beach at issue is approximately fifty acres and runs 1.7 miles along the southern coast of Edgartown in Martha's Vineyard, abutting the Atlantic Ocean to the south and abutting to the north, from west to east, the seaward end of Oyster Pond, Pohogonot uplands, the seaward end of Paqua Pond, more Pohogonot uplands, the seaward end of Big Job's Neck Pond, Short Point uplands, the seaward end of Little Job's Neck Pond, and the Kohlberg property. See the Appendix to this opinion, infra; White, 464 Mass. at 406, 982 N.E.2d 1115.[7]
*822 As described by the remand judge, the beach includes three main segments. The Oyster Pond section lies on the western end below Oyster Pond and abuts the beach area south of property formerly owned by George D. Flynn, Jr. (Uncle George) to the west, known as Oyster-Watcha. See White, 464 Mass. at 424, 982 N.E.2d 1115. Oyster Pond, as presently configured, is a long, narrow pond running north to south. For many of the years at issue, Oyster Pond has been "opened" to the ocean by creating a cut near the western edge of the beach (the cut). This in effect created two beach areas adjacent to Oyster Pond, the beach west of the cut and the beach east of the cut.
The Job's Neck section is comprised of the easternmost section of the beach and contains two fairly distinct barrier beaches, one below Big Job's Neck Pond, and one below Little Job's Neck Pond. The Job's Neck section also includes the beach south of the Short Point property and the 4.4-acre Kohlberg Option Beach that *734 lies below Little Job's Neck Pond on the far eastern end of the beach. Between the Oyster Pond section and the Job's Neck section is the Center section, which abuts the Pohogonot uplands, Paqua Pond, and Pohogonot Cove.
2. The parties and their relationship to the beach. The title history of the parcels at issue is set forth in White, 464 Mass. at 403-405, 982 N.E.2d 1115, and we do not repeat all of it here. For our purposes, it suffices to say that for much of the Twentieth Century, Uncle George and Winthrop B. Norton (Sonny) separately owned all of the property in the southwestern corner of Edgartown upland of the beach at issue. Sonny died in 1981 and Uncle George died in 1991. Their parcels have been divided among their families and other third parties. The plaintiffs' title derives from Sonny, and the defendants' title derives from Uncle George. We shall refer to the plaintiffs collectively as the "Nortons" or the "plaintiffs" and to the defendants collectively as the "Flynns" or the "defendants."[8]
The plaintiffs, either individually or as trustees, own properties located to the northeast of Oyster Pond. None of their properties abuts the beach. The parties agree that presently the sole access from the plaintiffs' properties to the beach is by boat across Oyster Pond, to the Oyster Pond section of the beach.[9] The defendants own properties to the north of the beach, and some parcels abutting the beach.
3. Title to the beach. Title to the beach was separated from title to the uplands by an 1841 deed. White, 464 Mass. at 410, 982 N.E.2d 1115. Quoting id. at 405, 982 N.E.2d 1115, the remand judge found that "[f]rom 1846 to 2005, the shoreline eroded at a rate of roughly five feet per year near the western boundary of the beach, and at a rate of approximately seven feet per year near its eastern boundary." The original Land Court judge found that the beach as it existed in 1846 is now submerged in the Atlantic Ocean and, "[i]n fact, the area on which the Beach was located as late as 1938 is, likewise, submerged in the Atlantic *823 Ocean." See White, supra at 405-406, 982 N.E.2d 1115. The Supreme Judicial Court held that the beach as it currently exists is located on the *735 former uplands of Paqua, Pohogonot, Isaac's Neck, and Short Point, now owned by the defendants. See ibr.US_Case_Law.Schema.Case_Body:v1">id. at 406 & n.12, 982 N.E.2d 1115. Although both the plaintiffs' and the defendants' predecessors held fractional fee interests in the separate beach lot described in the original 1841 deed, "at the time of trial, the Nortons had no title interest in the formerly upland property on which the beach is presently located." Id. at 406 n.12, 982 N.E.2d 1115. Accordingly, the plaintiffs now rely on their claim that they have an easement by prescription to use the entire 1.7-mile beach on the south shore of Edgartown.
To frame the time period of the prescriptive easement claim, it is important to note that the original trial judge "determined that the Nortons' deeded beach interest became completely submerged by the Atlantic Ocean no later than 1938. Thus, [the plaintiffs'] use of the beach thereafter would have been adverse." White, 464 Mass. at 413 n.18, 982 N.E.2d 1115. In November of 1999, the Flynns caused a public notice of their intention to prevent the acquisition of easements over the beach to be posted, served, and recorded in accordance with G. L. c. 187, §§ 3 and 4, thereby interrupting any adverse use. The plaintiffs' prescriptive easement claim, therefore, begins no earlier than 1938 and ends by November of 1999.
4. Judge's decision on remand. a. Open and notorious. The remand judge concluded that the plaintiffs or their predecessors openly used various portions of the beach for Sunday gatherings including sunbathing, picnicking, and other recreational activities without any effort of concealment and that their uses were sufficient to put the landowner on notice of their use. See White, 464 Mass. at 416-417, 982 N.E.2d 1115. The judge further found that the Nortons kept a distance from the Flynns out of respect for privacy and not as an effort to conceal their presence. The testimony of both families, the judge found, reflected an awareness of the other's presence on the beach sufficient to put the Flynns on notice of the Nortons' use.
b. Adverse. With regard to the question whether the Nortons used the beach adversely, the remand judge found that the plaintiffs and their predecessors used it with a sincere belief that they owned a fractional interest in the beach. The judge relied on the record as a whole in determining that both the Nortons and the Flynns believed that the Nortons had an ownership interest in the beach, and were apparently unaware of the impacts of erosion on the Nortons' fractional fee interest in the beach or that the separate beach lot created in 1841 had ceased to exist. The judge found *736 that "[i]n 1950, Uncle George and Sonny, together, engaged attorney Harry Perlstein to provide a legal opinion on the ownership interests in the then-existing beach." Perlstein opined that the Flynns owned a three-fifths interest in the beach and the Nortons owned a one-fifth interest. In addition, the judge relied on the testimony of John Flynn, born in 1938, who testified that growing up, he understood from Uncle George and Uncle George's brothers that Sonny Norton owned a fractional interest in the beach. The judge found that in 1982, when John Flynn and Uncle George questioned plaintiff Allen Norton's right to advertise and convey portions of Sonny's property with beach rights, Allen relied on the Perlstein opinion, and the Flynns did not further challenge his right to transfer interests in the beach. Although ultimately it was determined that the Perlstein opinion related to a beach that no longer exists, the Perlstein opinion bears on the Flynns' knowledge *824 of and acquiescence in the Nortons' use of the beach and the adversity of the use. White, supra at 418 n.25, 982 N.E.2d 1115. The remand judge specifically found that "the Nortons used the Beach under a claim of right and that the Flynns recognized that claim."
c. Permissive. Addressing the issue of permissive use, the remand judge found that "the evidence was sufficient to establish that ... the Nortons' use of the Beach was without 'permission' from the Flynns." The judge recognized that Uncle George had given Albert White and Allen Norton "blanket permission" to use certain portions of the Flynn property for hunting and fishing but found that there was no evidence that the Nortons had sought permission to use the beach because they believed that they owned a fractional interest; accordingly, the Nortons' use of the beach was adverse and under a claim of right.
d. Continuous. With regard to whether the plaintiffs had met their burden of continuous use of the whole or any part of the beach, the remand judge, relying on Boothroyd v. Bogartz, 68 Mass. App. Ct. 40, 45, 859 N.E.2d 876 (2007), found that the plaintiffs had to prove that their use was "substantially confined" to a specific "part of the parcel" for the twenty-year period of prescription. The judge found that the plaintiffs could not "simply rely upon a cumulative set of sporadic, disjointed, or intermittent uses -- occurring in several different locations at different times -- over the span of sixty years." Rather, they had to show a "consistent, regular pattern of their beach uses that continued for at least twenty years in one or more defined locations." The judge found that the plaintiffs did not sustain their burden to demonstrate that they had *737 used the whole fifty-acre beach or any particular subsection of it continuously for the requisite twenty years. The judge separately addressed the three sections of the beach.
i. Job's Neck section. The remand judge found that the plaintiffs' claim commenced in 1938 but that any use of Job's Neck was interrupted in 1956 when Allen Norton left the area, serving in the military for two years with only occasional visits home. From 1958 through the early 1980s, although there was testimony that the Norton family gathered on approximately seventy-five to eighty percent of good-weather summer Sundays in the Job's Neck section of the beach, the judge found that the testimony was inconsistent as to where on the Job's Neck section of the beach they gathered. The judge noted that Allen Norton and his daughter, Melissa, testified that the group gathered below Big Job's Neck Pond and occasionally below Little Job's Neck Pond, but that Allen's wife, Judy, testified that the family usually gathered below Little Job's Neck Pond. Other relatives testified that the family alternated between areas but did not testify as to the frequency at either part of the Job's Neck section of the beach. In light of the fact that the Job's Neck section spanned over one-half mile and included two barrier beaches below each pond and a third beach area between the two ponds, the judge found that the conflicting evidence as to where the group gathered was insufficient to meet their burden of showing continuous use of a substantially confined section of the beach.[10]
ii. Oyster Pond section. With regard to Oyster Pond, the remand judge noted that *825 Robert Carroll testified that he rented the "Point Camp," located north of Oyster Pond, from Sonny Norton, for fifteen years from 1966 to 1981. Although Carroll testified that he or his family used "the beach ... at the southern end of Oyster Pond" "all the time," the judge found that he did not specify which part of the Oyster Pond section of the beach he had used. The judge found that the vagueness of Carroll's testimony as to where on the beach he and his family congregated made it impossible to determine whether the location was the same as that used by the Nortons. Members of the Norton family testified that their use of the beach shifted to the Oyster Pond section, predominantly the section west of the cut, after Sonny's death in *738 1981, and has continued. Noting that the Flynns posted their "Notice to Prevent Easement" in 1999, the judge found that the plaintiffs had not demonstrated twenty years of continuous use of the beach near Oyster Pond. The judge further found that the Carrolls' uses prior to 1981 were too vague to "tack" on the Nortons' uses so as to create twenty years of continuous use before the 1999 posting.
iii. Center section. The remand judge found that the Nortons' use of the center portion of the beach from 1938 to 1999 was limited to occasional walks, shell or driftwood gathering, fishing, horseback riding, and Jeep or other vehicle rides. The rides on the beach were often incidental to Sunday gatherings at one of the other sections of the beach or occurred occasionally during the off season "to check on the land." The judge further found that there was no evidence that any of the uses were confined to any specific part of the three-quarter mile stretch of beach comprising the Center section. The judge thus found that the plaintiffs had failed to establish any prescriptive rights to use the Center section of the beach.
Discussion. We begin by reviewing the elements of an easement by prescription. Acquiring an easement by prescription requires "clear proof of a use of the land in a manner that has been (a) open, (b) notorious, (c) adverse to the owner, and (d) continuous or uninterrupted over a period of no less than twenty years." Smaland Beach Ass'n v. Genova, 94 Mass. App. Ct. 106, 114, 112 N.E.3d 814 (2018), quoting Boothroyd, 68 Mass. App. Ct. at 44, 859 N.E.2d 876. "The nature and the extent of occupancy required to establish a right by adverse possession [or by prescription] vary with the character of the land, the purposes for which it is adapted, and the uses to which it has been put." LaChance v. First Nat'l Bank & Trust Co. of Greenfield, 301 Mass. 488, 490, 17 N.E.2d 685 (1938). "Easements by prescription may be established in either of two ways: (1) by use with knowledge on the part of the owner, whose land is used, that the person using his land claims a right to use it, or (2) by a use so open and notorious that knowledge of a claim of right will be presumed." Houghton v. Johnson, 71 Mass. App. Ct. 825, 836, 887 N.E.2d 1073 (2008). Importantly, the actual state of mind of the claimant is not relevant. Totman v. Malloy, 431 Mass. 143, 146, 725 N.E.2d 1045 (2000). In other words, it is irrelevant that the Nortons may have used the beach without the intent of acquiring a title interest that they did not already have. See Kendall v. Selvaggio, 413 Mass. 619, 623-624, 602 N.E.2d 206 (1992) (possessor's intent not to deprive true owner of property does not prevent possessor from acquiring title through adverse *739 possession).[11] Similarly, *826 that an owner allows use because of the mistaken belief that the user has title or an easement does not defeat a prescriptive easement claim. See id. at 622, 602 N.E.2d 206 ("It is well established in Massachusetts that permissive use based on a mutual mistake as to the location of a boundary line will not defeat a claim of adverse possession"). As the remand judge noted, "continuous use" does not require "constant use." Bodfish v. Bodfish, 105 Mass. 317, 319 (1870). Moreover, where land is only suitable for "the usual beach and bathing purposes," a prescriptive right cannot be defeated on the ground that the land is "undeveloped [and] wild." Labounty v. Vickers, 352 Mass. 337, 348-349, 225 N.E.2d 333 (1967). Seasonal use may give rise to prescriptive rights. See Mahoney v. Heebner, 343 Mass. 770, 770, 178 N.E.2d 26 (1961) ; Lebel v. Nelson, 29 Mass. App. Ct. 300, 302, 560 N.E.2d 135 (1990). Indeed, we noted with approval in Houghton, 71 Mass. App. Ct. at 838 n.11, 887 N.E.2d 1073, the judge's finding in that case that seasonal use of a beach, even when limited to weekends, "does not defeat a claim for prescriptive easement rights."
1. Prescriptive easement to the whole beach. With these principles in mind, we next address the plaintiffs' principal argument that the judge applied an erroneous legal standard in concluding that the plaintiffs were required to demonstrate that their uses, in addition to being open, notorious, adverse, and continuous, were "substantially confined" to a discrete area or areas of the beach. The plaintiffs argue that where the Flynns were aware of the plaintiffs' claim that they had a title interest in all of the beach, their use of any portion of the beach in effect applied to all of the beach for purposes of evaluating duration and continuity of use. Thus, they contend, it should not matter that their use shifted to different areas of the beach; their use of any portion of the beach was sufficient to put the Flynns on notice that the plaintiffs claimed an easement over the whole.
In making this argument, the plaintiffs ignore a critical component of establishing an easement by prescription: actual use. "It is the general rule that prescriptive rights are measured by the extent of the actual adverse use of the servient property" (quotation and citation omitted).
*740 Tinker v. Bessel, 213 Mass. 74, 76, 99 N.E. 946 (1912). Intermittent and irregular use is insufficient to meet the plaintiffs' burden to prove an easement by prescription. See Boothroyd, 68 Mass. App. Ct. at 45, 859 N.E.2d 876 (use of locus that was "intermittent and disjointed in time" did not establish "a regular and continuous use, without interruption, over a twenty-year period"). See also Hoyt v. Kennedy, 170 Mass. 54, 56, 48 N.E. 1073 (1898) (while defendants could acquire prescriptive easement in one direction for one purpose and second easement in another direction for different purpose, defendants could not acquire right of way to pass and repass generally over plaintiff's premises where most convenient to them at various times). The remand judge found that the Flynns were aware that the Nortons believed they had a title interest in the entire beach, and that this knowledge was relevant to whether the Nortons' use was adverse. However, the Flynns' knowledge that the Nortons believed they had a title interest does not mean that the Nortons' use of one portion of the beach was tantamount to notice to the Flynns of the Nortons' use of the entire fifty-acre beach.
*827 It is true that pursuant to the doctrine of "color of title," when a claimant occupies a portion of land described in a flawed deed to the claimant, "the activities relied upon to establish adverse possession reach not only the part of the premises actually occupied, but the entire premises described in [the] deed to the claimant" (citation omitted). Paine v. Sexton, 88 Mass. App. Ct. 389, 392, 37 N.E.3d 1103 (2015). The plaintiffs, however, do not make a color of title claim. They point to no deed to the beach that purports to grant title to them or their predecessors with respect to the post-1938 beach now at issue, as the beach to which they held title has eroded away. Nor do they argue that the color of title doctrine should extend to easements by prescription. In fact, the plaintiffs protest comparison to color of title cases, calling them "undisputedly inapplicable." There is no doctrinal basis in the law governing prescriptive easements for the proposition that the use of different portions of an owner's property may be extended to the whole on the basis that both the true owner and the user believed that the user had a fractional title interest in the whole.
Focusing on the remand judge's determination that their use was not "confined substantially to a regular or particular ... part of the locus" (quotation and citation omitted), Boothroyd, 68 Mass. App. Ct. at 46, 859 N.E.2d 876, the plaintiffs contend that the language employed by the judge comes from cases addressing "right of way" easements and should not apply to their claim of an easement over an entire parcel, even a 1.7-mile long, fifty-acre beach *741 parcel. The plaintiffs cite no authority for distinguishing an easement by prescription over a way from an easement by prescription over a large beach in this manner. We regard the judge's choice of words as applied to the instant facts as simply reflecting the principle that a prescriptive easement extends only to the area actually used.
Moreover, our cases demonstrate that use of one part of a parcel does not give rise to an easement over the whole. For example, in Ottavia v. Savarese, 338 Mass. 330, 155 N.E.2d 432 (1959), the defendant's predecessors had inserted support beams into the first story of the plaintiff's predecessors' four-story building wall in order to create a new room. That use continued for a period of over twenty years. The defendant subsequently added a second story to the room, causing additional incursions into the plaintiff's building wall. Less than twenty years later, the plaintiff sued. Id. at 331-332, 155 N.E.2d 432. The Supreme Judicial Court concluded that the defendant had acquired a prescriptive right in the plaintiff's wall to the extent it supported the first-story room, but not the second-story room, holding that "[t]he limited use of the wall made by the defendant did not entitle her to prescriptive rights to the whole" four-story wall. Id. at 335, 155 N.E.2d 432.
In Houghton, the plaintiffs claimed an easement by prescription to the beach areas in front of lots 10 and 11. Houghton, 71 Mass. App. Ct. at 835, 887 N.E.2d 1073. We concluded that the plaintiffs' use of all of a beach for customary beach activities and their failure to confine themselves to the areas in front of lots 10 and 11 were some of the reasons that they had not established a prescriptive easement to the beach in front of lots 10 and 11. Id. at 843, 887 N.E.2d 1073. In other words, the prescriptive easement claim in Houghton failed, in part, because the users could not show that they confined their use to the claimed location.
In Pugatch v. Stoloff, 41 Mass. App. Ct. 536, 540-544, 671 N.E.2d 995 (1996), where the defendants claimed title by adverse *828 possession to a large area of their neighbors' land, while we recognized their title to the lawn, privet hedge, and railroad-tie retaining wall, which they had maintained for more than twenty years, we affirmed the lower court judge's finding that their occasional pruning of trees in a "wild," seemingly "unattended" portion of the property was insufficient to establish adverse possession. Again, prescriptive rights were recognized only over property that was actually used by the adverse possessors.
These cases affirm that actual use of the property over which a party claims prescriptive rights is a critical component of the claim, *742 and we discern no reason to depart from the long-standing requirement of actual use to acquire an easement by prescription. That the true owner was under the mistaken impression that the Nortons owned an interest in the entire beach does not eliminate the need to fulfill the actual use element of a prescriptive easement claim.
2. Elements of prescriptive easement. The plaintiffs contend that, in any event, the evidence shows that they met the prescriptive easement requirements for the entire beach. They argue in the alternative that they used each of the three "sections" of the beach identified by the remand judge for the requisite twenty years. The remand judge seems to have rejected out of hand the suggestion that the plaintiffs proved that they had used the entire beach for the requisite continuous twenty-year period. We agree that evidence of consistent use of the whole is lacking. The question is closer, however, when we consider individual sections of the beach. We turn then to the required elements, applying them as necessary to the individual sections of the beach identified by the judge.
a. Open, notorious, and adverse use. We agree with the remand judge that the Nortons used the beach openly, without effort to conceal their use. Indeed, the evidence suggests that the Flynns were well aware of the Norton family's summer use of the beach; thus, the objective of the requirement of open and notorious use, to put the true owner on notice of use, was met. In addition, for the reasons stated by the remand judge, we agree that the use was adverse to the defendants. We have carefully reviewed the remand judge's findings on permissive use, as they differ from the original judge's determination.[12] John Flynn's testimony supported the remand judge's finding that both families were acting under the mistaken belief, bolstered after 1950 by the opinion of Attorney Perlstein, that the Nortons owned a fractional interest in the beach. Even before 1950, though, the evidence showed that Uncle George was aware of and communicated his understanding to his nephew John Flynn that the Nortons held a fractional interest in the beach. Based on the record before us, the defendants' argument that Uncle George allowed the Norton family to use the beach because of their friendship and the prevalance of "neighborly accommodation" on Martha's Vineyard is speculative *743 at best. Moreover, that the Flynns acquiesced in the Nortons' use of the beach under the mistaken belief that the Nortons owned a fractional interest does not transform their acquiescence into permission. We conclude that the remand judge's finding that the Nortons' use of the beach was adverse to the Flynns is not clearly erroneous. *829 b. Continuous use. For the time period between 1938 and 1958, the plaintiffs principally rely on Allen Norton's use of the beach. Allen was born in 1934, and his first memory of using a specific section of the beach was in 1941 when he was seven. We therefore conclude that the finding that the plaintiffs' claim commences in 1938 is not supported by the evidence, and the proper starting point is no earlier than 1941.[13]
i. Oyster Pond section. Allen testified that from 1948 and through 1956 he used the beach near Oyster Pond every weekend in the summer because his family had constructed a home and moved to the "homestead" north of Oyster Pond in 1948.[14] Even if we assumed the truth of Allen's testimony as to his use of the Oyster Pond end of the beach from 1948 to 1958,[15] we are left with his testimony that his use of the Oyster Pond end of the beach after 1958 was sporadic at best (three to four times per season), as he and his family shifted their use back to the Job's Neck area until the early 1980s. His testimony was corroborated by other family members in this regard. Thus, any adverse use of the Oyster Pond end of the beach begun in 1948 was interrupted by 1958. While the Nortons shifted their use back to the Oyster Pond end of the beach nearly exclusively some time between 1981 and 1983, the notice to prevent acquisition of prescriptive easements was posted in 1999. Thus, there simply was no evidence of a continuous twenty-year period of use of the beach south of Oyster *744 Pond by the plaintiffs or their predecessors or lessees.[16]
ii. Center section. The absence of testimony attributing any particular route or area to which the plaintiffs confined their use of the center section of the beach is fatal to their claim of a prescriptive easement over that section of the beach. See discussion part 1, supra.
iii. Job's Neck section. From 1958 to 1983, Allen lived in Edgartown but used "the beach" on most Sundays during the summer, as did the family of his sister, Wilda. He estimated, however, that they used the Job's Neck section of beach seventy-five percent of good-weather Sundays and used the beach south of Oyster Pond twenty-five percent of good-weather Sundays in the summer. The remand judge found that Judith Norton's testimony largely paralleled Allen's with regard to the pattern of use on Sundays during the summers except that she testified that between *830 1958 and 1981,[17] they used the beach in front of Little Job's Neck Pond, while Allen testified that they used the beach south of Big Job's Neck Pond. The remand judge also found that the testimony of other Norton family members was inconsistent as to whether they set up for the day in the area of Big Job's Neck Pond or Little Job's Neck Pond. It was this contradictory testimony that at least in part caused the judge to determine that the plaintiffs had not met their burden of proving continuous use of any particular area of the beach.
This issue highlights the difficulty of the judge's task on remand, having not heard the testimony of the various witnesses. If the remand judge had taken evidence and witnesses had testified as they did during the original trial, the judge could have credited Allen's testimony that the Norton family members set up at the beach to the south of Big Job's Neck Pond on seventy-five percent of fair-weather Sundays from 1958 through 1983. Alternatively, *745 under those circumstances, the remand judge could have credited other witnesses and found that the Norton family members set up south of Little Job's Neck Pond during the period from 1958 to 1981. As the Supreme Judicial Court commented in White, 464 Mass. at 414, 982 N.E.2d 1115, where the evidence is "voluminous and contradictory, it is particularly important that the judge's findings of fact be of sufficient detail." Our assessment of the record before us differs from that of the remand judge in that we do not regard the testimony given at the original trial as hopelessly contradictory. Accordingly, unlike the remand judge, we do not agree that, as a matter of law, the plaintiffs did not meet their burden of proof with respect to their continuous use of the Job's Neck section over a period of twenty years.
Rule 63 of the Massachusetts Rules of Civil Procedure, 365 Mass. 831 (1974), provides, in pertinent part, that if, due to resignation, "a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after ... findings of fact and conclusions of law are filed, then any other judge ... assign[ed] by the Chief Justice ... [may] perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial." In the circumstances of this case, where the Supreme Judicial Court concluded in White, 464 Mass. at 420, 982 N.E.2d 1115, that "the meager findings do not permit us to infer the credibility determinations the judge may have made," and the decision on remand highlights again the importance of those credibility determinations, we conclude that the remand judge abused her discretion insofar as she denied the defendants' motion a for new trial on the issue whether the plaintiffs met their burden of proof of a prescriptive easement in the Job's Neck section. See Adoption of Iris, 427 Mass. 582, 588, 695 N.E.2d 645 (1998) (decision whether to grant new trial rests in discretion of trial judge). We are compelled, therefore, to vacate that aspect of the judgment and remand for further proceedings on the plaintiffs' claim that their adverse use of a reasonably definite section of the Job's Neck section continued for the requisite twenty years.
*831 3. Continuing erosion. The remand judge did not address the defendants' argument that any use of the beach after 1938 was not even on the beach as it exists today. The ever-eroding beach, they argue, continues to recede, and any part of the beach used by the Nortons over the sixty-year period since 1958 is now submerged.
*746 The plaintiffs presented expert testimony that there continues to be some overlap between the 1938 beach and the present beach. There was some dispute, however, whether that would be true if the definition of "beach" were limited to the sandy areas the evidence suggests the Nortons used. The defendants argue that the expert's exhibits demonstrate that most if not all of the pertinent areas of the beach have been absorbed by the sea. Thus, they claim, even if the plaintiffs have demonstrated that they occupied portions of the beach over the requisite period, those beach areas no longer exist and, therefore, the plaintiffs' claim must fail because they have not shown their occupation of the presently existing beach. Neither the original judge nor the remand judge made any findings on this issue. Consideration of whether the plaintiffs have met their burden of proving a prescriptive easement in the Job's Neck section should include consideration of whether the beach as it presently exists coincides with the area used to acquire any prescriptive rights.[18]
4. Use appurtenant to plaintiffs' properties. Finally, the defendants argue that the plaintiffs never proved that the various uses over the years were appurtenant to the properties currently held by the plaintiffs. There was no suggestion in the record that the Nortons' use of the beach was without Sonny's permission when he was alive and owned the plaintiffs' properties. Rather, testimony revealed that the Nortons' beach uses often began or ended with a visit to Sonny while he was alive. Thereafter, the property was divided among Sonny's children and grandchildren. There is no suggestion in the record that the Flynns were unaware that the Nortons were using the beach pursuant to Sonny's purported ownership interest and, after Sonny's death, their own *747 interests.[19]
Conclusion. In sum, we find no error or abuse of discretion in the remand judge's determination that the plaintiffs have no *832 easement by prescription in either the beach area south of Oyster Pond or the Center beach area. However, further fact finding is required to determine whether the plaintiffs have an easement by prescription over any portion of the eastern end of the beach, the Job's Neck section. Those proceedings may take the form of a new trial limited to that issue. Alternatively, the judge and the parties may agree on a different procedure, though credibility determinations and findings will be necessary. Resolving the plaintiffs' claim should include consideration of whether the uses they made of the area were made on portions of the beach that continue to exist. Accordingly, so much of the judgment after remand as determined that the plaintiffs do not have an easement by prescription over any portion of the eastern end of the beach (the Job's Neck section on the plan found in the Appendix) is vacated, and the matter is remanded for further proceedings consistent with this opinion. In all other respects, the judgment after remand is affirmed.
So ordered.
*748 Appendix.
?

In her decision, the remand judge stated:
"[B]ased on my subsidiary findings of fact as set forth below, and for the reasons discussed herein, I conclude that Plaintiffs failed to meet their burden of establishing a prescriptive beach easement over the 'whole' beach, as they claim, nor any part thereof. Plaintiffs have not established any prescriptive beach rights, either because their various uses of the beach were occasional and sporadic, did not continue uninterrupted for the full, requisite twenty-year period, and/or were not substantially confined to a regular part or parts of the beach."

Because the defendants do not ask us to alter the judgment, it was not necessary to file a cross appeal.

There was a stipulation at trial that at least Oyster Pond and Big Job's Neck Pond are on the Commonwealth's list of great ponds. "[A] pond that exceeds ten acres in its natural state is a great pond. ... With limited exceptions, the waters of a great pond and the land that comprises the bed of the pond to the natural low water mark belong to the Commonwealth, and the ponds are held in trust for certain public uses." Opinion of the Justices to the Senate, 474 Mass. 1201, 1203, 52 N.E.3d 1011 (2016). The parties reserved their rights with regard to whether Paqua Pond should be considered a great pond and questioned whether Little Job's Neck Pond is a great pond. Additionally, the parties contest whether the ponds are Commonwealth-owned great ponds. The trial judge explicitly stated that the legal implications of the beach migrating into the beds of great ponds was not an issue before him. We assume without deciding, as the parties seem to do, that for the purposes of this opinion, the portions of the beach that have migrated into the abutting great ponds are owned by the defendants, who own the property abutting the ponds with the exception of the property to the west of Oyster Pond, an area known as Oyster-Watcha, which George Flynn sold in 1981.

As the Supreme Judicial Court noted, "The parties are not all members of [the Norton and Flynn] families, but all title interests in the property are derived from title historically held by the respective families." White, 464 Mass. at 401 n.4, 982 N.E.2d 1115.

Prior decisions in this case have determined that the plaintiffs have no prescriptive easements over the roads leading to the beach, and the plaintiffs have not appealed from that determination.

The remand judge found that the Nortons' testimony was consistent that after 1981, they did not make routine use of any portion of the Job's Neck section during the summer but, rather, shifted their Sunday gatherings to the beaches south of Oyster Pond.

The elements of adverse possession and prescriptive easement are the same with regard to the open, notorious, continuous, and adverse use requirements. Rotman v. White, 74 Mass. App. Ct. 586, 589, 908 N.E.2d 846 (2009). See Boothroyd, 68 Mass. App. Ct. at 44 & n.9, 859 N.E.2d 876. Parties claiming adverse possession must also prove the additional element of exclusive use. Id.

We reject the defendants' contention that the remand judge lacked authority to make a finding as to permission or any other element that differed from the trial judge. Nothing in the remand order so limited the remand judge.

As will be discussed infra, the starting dates for the plaintiffs' prescriptive easement claims may vary for each particular section of the beach.

There was deposition testimony from Peter McCagg that his family rented the Norton "farmhouse" on Oyster Pond and that he used the beach south of Oyster Pond two to three times per week between 1937 and 1942. McCagg's use of the beach stopped in 1942. Although his family continued to rent the farmhouse for at least some portions of the summer through 1948, there was no testimony as to their use of any portion of the beach after 1942. With an interruption of at least six years, the McCaggs' use cannot be tacked to the Nortons' use of the beach south of Oyster Pond, begun in 1948.

We need not pass on whether, as the judge found, Allen Norton's active military service beginning in 1956 interrupted a period of adverse use, as even if the period from 1956 to 1958 is included, there was no showing of use over a twenty-year period.

The remand judge found that the use of the Oyster Pond section from 1966 to 1981 by Sonny's tenant, Robert Carroll, could not be tacked on to the Nortons' uses because of an absence of detail as to the location of the use within the Oyster Pond section. See background part 4.d.ii, supra. After reviewing the evidence, we conclude that the judge's finding in this regard was not clearly erroneous.

The plaintiffs' testimony varies as to when, between 1981 and 1983, they shifted from primarily using Job's Neck to primarily using Oyster Pond. When considering the period of prescription, nothing turns on the difference; with the 1999 posting considered as the end point of any prescriptive period, the plaintiffs primarily used the Job's Neck section for thirty-three to thirty-five years and the Oyster Pond section for sixteen to eighteen years.

The plaintiffs claim in their reply brief that the Supreme Judicial Court held in White, 464 Mass. at 408 n.14, 982 N.E.2d 1115, that an easement by prescription established through beach activities moves with the land. That is not a correct reading of White, which did not address this precise question. In White, the court explained that under the common law, shoreline (littoral) boundaries are not fixed because natural processes of accretion and erosion cause them to change. Id. at 407, 982 N.E.2d 1115. The court also explained that, ordinarily, nonlittoral boundaries of shoreline property are fixed. Id. at 407-408, 982 N.E.2d 1115. The court acknowledged that there are several Massachusetts precedents in which "easements appurtenant to beaches ... were held to move as the beach shifted" because in those cases the easements "were granted explicitly to enable particular uses of the shoreline." Id. at 408 n.14, 982 N.E.2d 1115. Insofar as the plaintiffs maintain that this case involves an analogous exceptional circumstance in which there is an easement by prescription that moves with the land, the question is best left for the judge to resolve in the first instance on remand.

We need not consider the defendants' argument, made without citation to authority, that use by Sonny's children and grandchildren while they were not living on property owned by Sonny cannot be counted as prescriptive use by Sonny. See Mass. R. A. P. 16 (a) (9), as appearing in 481 Mass. 1628 (2019). In any event, there is authority to the contrary. See, e.g., Ryan v. Stavros, 348 Mass. 251, 263, 203 N.E.2d 85 (1964) (noting use of business invitees in support of adverse possession claim).